1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                            DISTRICT OF OREGON

9                            PORTLAND DIVISION

10

11

**ELLISLAB, INC.,** an Oregon                    No. 3:12-cv-00432-HU
12 Corporation,
                                                   **FINDINGS AND**
13              Plaintiff,                      **RECOMMENDATION**

14       v.

15 **GIPPY'S INTERNET SOLUTIONS, LLC,**
   a Minnesota limited liability
16 company,

17              Defendant.
   ─────────────────────────────────────
18
   Matthew A. Levin
19 Stacy R. Owen
   MARKOWITZ, HERBOLD, GLADE & MEHLHAF, PC
20 Suite 3000 Pacwest Center
   1211 SW Fifth Avenue
21 Portland, OR 97204-3730

22       Of Attorneys for Plaintiff

23 Jeffrey A. Bowersox
   BOWERSOX LAW FIRM, PC
24 5285 Meadows Rd., Suite 320
   Lake Oswego, OR 97035
25
   Christopher K. Sandberg
26 LOCKGRIDGE GRINDAL NAUEN, PLLP
   100 Washington Avenue South, Suite 2200
27 Minneapolis, MN 55401

28       Of Attorneys for Defendant

   Page 1 - FINDINGS AND RECOMMENDATION

1  **HUBEL, J.,**

2      In this Lanham Act case, defendant Gippy's Internet Solutions,

3  LLC ("Defendant") moves to dismiss for lack of personal

4  jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule")

5  12(b)(2) or, alternatively, for a convenience venue transfer to the

6  District of Minnesota.   For the following reasons, Defendant's

7  motion (Docket No. 7) should be DENIED in its entirety.

8                          *I.   BACKGROUND*[1]

9      Plaintiff is an Oregon corporation with its principal place of

10  business in Beaverton, Oregon.   (Am. Compl. ¶ 1.)   Plaintiff

11  develops software and services that enable consumers to maintain

12  their website content without the need for technical expertise.

13  (Am. Compl. ¶¶ 1,7.)   Defendant is a Minnesota limited liability

14  company with its principal place of business in Minneapolis,

15  Minnesota.  (Am. Compl. ¶ 2.)  Defendant is a provider of business-

16  focused web hosting services.   (Am. Compl. ¶ 7; Def.'s Mem. Supp.

17  at 7.)  A web hosting service allows individuals and/or businesses

18  to make their website accessible via the Internet by storing the

19  website on the host's server and connecting that website to the

20  Internet.  (Ellis Decl. ¶ 3.)

21      In 2002, Plaintiff released the first version of its website

22  publishing software, "pMachine."   (Am. Compl. ¶ 7.)   That same

23  year, Plaintiff entered into an agreement with Defendant, wherein

24  Plaintiff validly licensed its marks to Defendant and provided a

25

26  _____

27      [1] The facts recited in this Findings and Recommendations are
    for the purpose of resolving of this motion and are not to be
    construed as findings of fact that the parties may rely on in
28  future proceedings in this case.

1  link for customers from Plaintiff's website (where users could

2  purchase Plaintiff's web publishing software) to a web portal

3  called www.pmachingehosting.com ("the pMachine website" or "the web

4  portal").[2]  (Am. Compl. ¶ 16.)  Plaintiff's founder, Rick Ellis

5  ("Ellis"), created the pMachine website in California and launched

6  it while living and working in Oregon.[3]  (Ellis Decl. ¶ 3.)

7      At the pMachine website, customers could purchase Defendant's

8  web hosting services tailored to work with Plaintiff's web

9  publishing software, as well as packages that bundled together both

10  Plaintiff's software and Defendant's web hosting services.  (Am.

11  Compl. ¶ 16.)  The parties agreed that in exchange for the license

12  to use Plaintiff's marks and the ability to serve customers

13  originating from Plaintiff's website, the parties would share the

14  revenues generated by the pMachine website.  (Am. Compl. ¶ 18.)  It

15  was also understood that Defendant would handle all day-to-day

16  operations of the site.  (Ellis Decl. ¶ 3.)

17      In August of 2006, Defendant's founder, Nevin Lyne ("Lyne"),

18  traveled to Ellis' home in Bend, Oregon for a business meeting.

19  (Ellis Decl. ¶ 5.)  During that meeting, Ellis and Lyne entered

20  into a second oral agreement regarding the rebranding of Ellis'

21  company and decided to change the name of the web portal from

22

23      [2] Plaintiff owns, among other things, the pMachine trademark

24  for content management software.  (Am. Compl. ¶ 8.)

25      [3] It is not uncommon for business entities to engage in
   revenue sharing in areas as diverse as web portals.  *See generally*

26  *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d
   1019, 1055 (9th Cir. 2010) (citing an article which discussed

27  several newspapers that linked up with Yahoo! and agreed to turn
   over half of the revenue from ads the newspapers sold on the web

28  portal).

Page 3 - FINDINGS AND RECOMMENDATION

www.pmachinehosting.com to www.enginehosting.com ("the Engine website"). (Ellis Decl. ¶ 5.) Plaintiff completed the web portal's name change in 2007 and Defendant continued to handle all day-to-day operations of the site. (Ellis Decl. ¶ 6.)

In February of 2012, Plaintiff learned that Defendant had been secretly underpaying them its share of the revenue generated by the website. (Am. Compl. ¶ 25.) Apparently, Defendant had been shifting customers to certain custom hosting packages which Defendant unilaterally determined were outside the scope of the parties' agreement. (Am. Compl. ¶ 27.) Defendant also filed trademark applications for the names "EngineHosting and "Engine Hosting Powering the Dynamic Web!" without informing Plaintiff. (Am. Compl. ¶ 28.)

Plaintiff filed this lawsuit a month later in March of 2012. On April 23, 2012, Plaintiff filed an amended complaint against Defendant, asserting claims of (1) false designation of origin and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement under §§ 1114(1)(a) and 1116(d); (3) false advertisement and unfair competition under § 1125(a); and (4) breach of contract. Defendant's motion to dismiss or, alternatively, to transfer venue followed on May 2, 2012.

## II.  LEGAL STANDARD

### A.  Personal Jurisdiction

In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). When the district court decides

1  the motion without an evidentiary hearing, as is the case here,
2  then "the plaintiff need only make a prima facie showing of the
3  jurisdictional facts." *Id*. The court's sole inquiry is whether
4  the plaintiff's pleadings and affidavits make a prima facie showing
5  of personal jurisdiction. *Id*. (citing *Caruth v. Int'l*
6  *Psychoanalytical Ass'n*, 59 F.3d 126, 127-28 (9th Cir. 1995)). The
7  court is required to take as true any uncontroverted allegations in
8  the plaintiff's complaint. *Id*. (citation omitted). If there are
9  any conflicts between the parties over statements contained in
10 affidavits, then the court must resolve the conflicts in the
11 plaintiff's favor. *Id*. (citing *Schwarzenegger v. Fred Martin Motor*
12 *Co.*, 374 F.3d 797, 800 (9th Cir. 2004)).

13     In diversity cases, the court is instructed to look to the law
14 of the state in which it resides to determine whether personal
15 jurisdiction over the non-resident exists. *W. Helicopters, Inc. v.*
16 *Rogerson Aircraft Corp.*, 715 F. Supp. 1486, 1489 (D. Or. 1989)
17 (citing *Hunt v. Erie Ins. Group*, 728 F.2d 1244, 1246 (9th Cir.
18 1984)). In Oregon, the long-arm statute, ORCP 4L, creates a
19 standard that is co-extensive with federal jurisdictional
20 standards, thereby permitting a federal court sitting in the
21 District of Oregon to exercise personal jurisdiction so long as
22 within the limits of federal constitutional due process. *Gray &*
23 *Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990)
24 (citing ORCP 4L; *Or. ex rel. Hydraulic Servocontrols Corp. v. Dale*,
25 294 Or. 381, 657 P.2d 211, 212 (1982)).

26     Constitutional due process requires that a defendant have
27 certain minimum contacts with the forum state such that the
28 maintenance of the suit does not offend "traditional notions of

Page 5 - FINDINGS AND RECOMMENDATION

1  fair play and substantial justice." *Int'l Shoe Co. v. State of*
2  *Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311
3  U.S. 457)).   The pertinent determination for the court is whether
4  the "defendant's conduct and connection with the forum [s]tate are
5  such that he should reasonably anticipate being haled into court
6  there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297
7  (1980).

8                    **B.   *Motion to Transfer Venue***

9       Section 1404(a) provides: "For the convenience of the parties
10 and witnesses, in the interest of justice, a district court may
11 transfer any civil action to any other district or division where
12 it might have been brought." 28 U.S.C. 1404(a) (2006). Generally,
13 a plaintiff's choice of forum is given "great weight," *Lou v.*
14 *Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987), and defendants "must
15 make a strong showing of inconvenience to warrant upsetting the
16 plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth*
17 *Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).   But § 1404(a)
18 ultimately places discretion in the district court to evaluate
19 convenience transfers on a case-by-case basis for convenience and
20 fairness.   *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 23
21 (1988).

22                    **III.   DISCUSSION**

23          **A.   *Defendant's Rule 12(b)(2) Motion to Dismiss***

24       Generally, there are two types of personal jurisdiction that
25 a court may have over a defendant, general and specific.   A
26 defendant can be subject to general jurisdiction if they have
27 continuous and systematic contacts with the forum state. *Reebok*
28 *Intern. Ltd. v. McLaughlin*, 49 F.3d 1387, 1391 (9th Cir. 1995).   If

Page 6 - FINDINGS AND RECOMMENDATION

general jurisdiction is inapplicable, the court must then determine whether specific jurisdiction exists. *In re Tuli*, 172 F.3d 707, 713 n.5 (9th Cir 1999). I will proceed first to the general jurisdiction analysis.

## 1.   *General Jurisdiction*

Defendant argues that the nature and extent of their contacts with Oregon are insufficient to subject it to general jurisdiction. For general jurisdiction to exist, "the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Schwarzenegger*, 374 F.3d at 801 (internal quotation marks and citations omitted). The Ninth Circuit has set a high standard for general jurisdiction, *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006), because such a finding "permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger*, 374 F.3d at 801. Factors to be taken into consideration include whether the nonresident defendant "makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000), *overruled on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) (en banc).

Defendant submits Lyne's declaration as evidence that there is no basis for general jurisdiction here. Lyne's declaration provides, in pertinent part, that:

Page 7 - FINDINGS AND RECOMMENDATION

1   •   "[T]here have been between 90 and 110 clients that have signed
2        up from the state of Oregon in the 10 years since [Defendant]
3        began working with [Plaintiff]."
4   •   "Clients in Oregon have, over the last 10 years, represented
5        about 1.5% of [Defendant]'s hosting clients."
6   •   Defendant "has never had a major (high priced) client from
7        Oregon, and virtually all of the Oregon clients have been in
8        the $10 to $20 per month range."
9   •   "I believe that [Defendant]'s overall revenue from Oregon-
10       based clients is a fraction of a percent of [Defendant]'s
11       overall revenues."
12   •   Defendant "has never made any specific effort to go after
13       businesses in Oregon for web hosting services."
14   •   Defendant "has never been registered or licensed to do
15       business in Oregon. [Defendant] has never paid any taxes to
16       Oregon. [Defendant] does not now and has never had a bank
17       account in Oregon."
18   •   Defendant "has never targeted any print, television, or radio
19       advertising toward Oregon."
20 (Lyne Decl. ¶¶ 15, 17, 19-23.)
21      In response, Plaintiff points out that Defendant (1) conducted
22 business with Oregon customers via its interactive website; (2)
23 maintained "traditional business contacts" (primarily in the form
24 of email communication after customers sign up for services through
25 Defendant's website); (3) conducted business with an Oregon
26 corporation (Plaintiff); (4) sent commission payments to Oregon,
27 either to Ellis or wired directly to Plaintiff's Oregon bank
28 account; and (5) traveled to Oregon to conduct business with
Page 8 - FINDINGS AND RECOMMENDATION

1  Plaintiff (i.e., the August 2006 meeting at Ellis' home in Bend,
2  Oregon).

3      Defendant's contacts fall well short of the requisite showing
4  for general jurisdiction. "A court may assert general jurisdiction
5  over foreign (sister-state or foreign-country) corporations to hear
6  any and all claims against them when their affiliations with the
7  State are so 'continuous and systematic' as to render them
8  essentially at home in the forum State." *Goodyear Dunlop Tires*
9  *Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). That is
10 not what we have here.

11     Two examples suffice to illustrate this point. In *Perkins v.*
12 *Benquet Consol. Mining Co.*, 342 U.S. 437 (1952), which was recently
13 described by Supreme Court as the "textbook case of general
14 jurisdiction appropriately exercised," *Goodyear*, 131 S. Ct. at 2856
15 (citation and internal quotation marks omitted), the defendant was
16 a Philippine corporation whose mining operations were halted while
17 the Japanese occupied the Phillippines during World War II.
18 *Perkins*, 342 U.S. at 447. As a result, the president, who was also
19 the general manager and principal stockholder of the company,
20 returned to his home in Ohio, where he ran a corporate office. *Id.*
21 The president "did many things on behalf of the company" in Ohio.
22 *Id.* at 448. He kept business files there; handled corporate
23 correspondence; drew employee's salaries from accounts in Ohio
24 banks that carried substantial balances of company funds; held
25 director meetings; and supervised policies dealing with the
26 rehabilitation of the corporation's properties in the Phillippines.
27 *Id.*

28

Page 9 - FINDINGS AND RECOMMENDATION

1    By contrast, in *Mavrix Photo, Inc. v. Brand Technologies,*
2 *Inc.*, 647 F.3d 1218 (9th Cir. 2011), it was argued that Brand, an
3 Ohio corporation that operated an interactive website called
4 celebrity-gossip.net, was subject to general jurisdiction in
5 California.   *Id.* at 1222.   Brand and its website had several
6 specific ties to California, including (1) Brand made money from
7 third-party advertisements for jobs, hotels, and vacations in
8 California; (2) the website featured a "Ticket Center," which
9 enabled third-party vendors to sell tickets to events in
10 California; (3) Brand had several agreements with California
11 businesses; (4) a California Internet advertising agency solicited
12 buyers and placed advertisements on the website; (5) a California
13 wireless phone service provider designed and hosted on its servers
14 a version of the website that was accessible to cell phone users;
15 (6) a California firm designed the website and performed site
16 maintenance; and (7) Brand entered a "link-sharing" agreement with
17 a California-based national new site, according to which each site
18 agreed to promote the other's top stories.   *Id.*   The Ninth Circuit
19 held that Brand's contacts fell "well short of the requisite
20 showing for general jurisdiction" and "reiterate[d] that Brand
21 ha[d] no offices or staff in California, [was] not registered to do
22 business in the state, ha[d] no registered agent for service of
23 process, and pa[id] no state taxes."   *Id.* at 1225.   The level of
24 activity rejected in *Mavrix* as insufficient to make out a case for
25 general jurisdiction is greater than exists on the record before
26 this court.
27    In this case, as in *Mavrix*, Defendant's contacts with Oregon
28 are not so "continuous and systematic" as to render them

Page 10 - FINDINGS AND RECOMMENDATION

essentially at home in this state.  Defendant does not have an office or staff in Oregon, is not registered to do business in the state, has no registered agent for service of process in Oregon, and does not pay Oregon state taxes.  Plaintiff makes much of the fact that "[t]hrough [Defendant]'s interactive website a visitor can become a customer of [Defendant]'s in just a few 'clicks,' . . . without ever leaving his or her chair in Oregon." (Pl.'s Mem. Opp'n at 7.)  As the Ninth Circuit has observed, rejecting an argument similar to the one raised by Plaintiff, "the level of interactivity of a nonresident defendant's website provides limited help in answering the distinct question whether the defendant's forum contacts are sufficiently substantial, continuous, and systematic to justify general jurisdiction." *Mavrix*, 647 F.3d at 1227 (citations omitted).  Accordingly, Defendant's contacts with Oregon, even considered collectively, do not justify the exercise of general jurisdiction.

## 2.  *Specific Jurisdiction*

In the alternative, Plaintiffs argues that Defendant has sufficient minimum contacts with Oregon to justify the exercise of specific jurisdiction.  Courts in the Ninth Circuit analyze specific jurisdiction under a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Page 11 - FINDINGS AND RECOMMENDATION

1  *Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d
2  1416, 1421 (9th Cir. 1987)).  Plaintiff bears the burden on the
3  first two parts of the test and, if this burden is met, Defendant
4  must come forward with a compelling case why the exercise of
5  jurisdiction would not be reasonable. *Boschetto*, 539 F.3d at 1016.

6      The first prong of the specific jurisdiction test refers to
7  both purposeful direction and purposeful availment.  A purposeful
8  availment analysis is most often used in suits sounding in
9  contract, while a purposeful direction analysis is used in suits
10 sounding in tort. *Schwarzenegger*, 374 F.3d at 802.  Although
11 Plaintiff has brought both contract and tort claims here, I find
12 the purposeful availment analysis dispositive. *See Brayton Purcell*
13 *LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)
14 ("The first prong is satisfied by either purposeful availment or
15 purposeful direction[.]")

16     In *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191 (9th Cir.
17 1988), the Ninth Circuit observed that: "In order to have
18 purposefully availed oneself of conducting activities in the forum,
19 the defendant must have performed some type of affirmative conduct
20 which allows or promotes the transaction of business within the
21 forum state." *Id.* at 1195.  For example, "the solicitation of
22 business in the forum state that results in business being
23 transacted or contract negotiations will probably be considered
24 purposeful availment." *Id.*; *Peterson v. Highland Music, Inc.*, 140
25 F.3d 1313, 1320 (9th Cir. 1988) ("Contract negotiations are classic
26 examples of the sort of contact that can give rise to *in personam*
27 jurisdiction[.]"); *Decker*, 805 F.2d at 840 ("[C]onducting contract
28 negotiations in the forum state will probably qualify as an

Page 12 - FINDINGS AND RECOMMENDATION

1    invocation of the forum law's benefits and protections.")    And
2    "[i]n return for these benefits and protections, a defendant must-
3    as a quid pro quo- submit to the burdens of litigation in that
4    forum." *Schwarzenegger*, 374 F.3d at 802 (internal quotation marks
5    and citation omitted).

6        In this case, Defendant has purposefully availed itself of the
7    privilege of doing business in Oregon.  In July of 2006, Ellis sent
8    Lyne an email indicating that there were some issues that the
9    parties had "never discussed," including, but not limited to: (1)
10   "What happens if one or the other party decides to walk away?"; (2)
11   "Who holds claim to the name pMachine Hosting?"; (3) "What clients
12   are exempt from our commission?"; (4) "What expenses are shared and
13   which are not?"; and (5) "Does pMachine, Inc. get paid a percentage
14   of the full purchase amount made by the client, or is it amortized
15   monthly based on the hosting plan[?]" (Ellis Decl. Ex. 1 at 2-3.)
16   In August of 2006, at his own suggestion, Lyne traveled to Ellis'
17   home in Bend, Oregon and the parties "entered into a second oral
18   agreement regarding the rebranding of [Ellis'] company" and decided
19   to change "the portal website from 'pMachineHosting.com' to
20   'EngineHosting.com.'" (Ellis Decl. ¶ 5.)  Lyne also sent Ellis an
21   email on March 15, 2007, seeking to renegotiate Defendant's
22   commission.  (Ellis Decl. ¶ 7.)  In the March 2007 email, Lyne's
23   terms were preceded by the phrase "[s]o here is what I would like
24   to offer and see if its something you could deal with." (Ellis
25   Decl. Ex. 2 at 2.)  Those terms were accepted by Ellis while he was
26   still living and working in Oregon.  (Ellis Decl. ¶ 7.)
27   Accordingly, I find that Defendant purposefully availed itself of
28   the laws and benefits of Oregon.

Page 13 - FINDINGS AND RECOMMENDATION

1    With respect to the second prong, the Ninth Circuit has
2  adopted a "but for" test in determining whether a claim arises from
3  the defendant's forum related activities. *Mattel, Inc. v. Greiner*
4  *& Hauser GMBH*, 354 F.3d 857, 864 (9th Cir. 2003). The question can
5  be formulated as this: But for Defendant's contacts with Oregon,
6  would Plaintiff's claims against Defendant have arisen? I answer
7  that question in the affirmative. Plaintiff's breach of contract
8  claim is based on the parties' agreement regarding "the revenues
9  generated by www.pmachinehosting.com and www.engingehosting.com,"
10  (Am. Compl. ¶ 53), which is directly related to Defendant's forum
11  related activities. *Cf. Decker*, 805 F.2d at 840 (determining that
12  a claim arose out of forum-related activities based on the
13  disruption of the plaintiff's contractual expectations).

14    With respect to the third prong, seven factors are considered
15  in determining whether the exercise of jurisdiction must comport
16  with fair play and substantial justice:

17        (1) the extent of the defendants' purposeful injection
        into the forum state's affairs; (2) the burden on the
18        defendant of defending in the forum; (3) the extent of
        the conflict with the sovereignty of the defendant's
19        state; (4) the forum state's interest in adjudicating the
        dispute; (5) the most efficient judicial resolution of
20        the controversy; (6) the importance of the forum to the
        plaintiff's interest in convenient and effective relief;
21        and (7) the existence of an alternative forum.

22  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1080 (9th
23  Cir. 2011) (citation omitted).

24    After reviewing the pleadings, I conclude that Defendant has
25  failed to present a compelling case that this Court's exercise of
26  personal jurisdiction over it is unreasonable. In coming to this
27  conclusion, I am most persuaded by factors one, two, four, and
28

Page 14 - FINDINGS AND RECOMMENDATION

1  six.[4]   The first factor weighs in favor of Plaintiff because, as

2  discussed above, Defendant has purposely injected itself into

3  Oregon's affairs.   Defendant had up to 110 web hosting customers

4  from Oregon over the last ten years and entered into a revenue-

5  sharing agreement with an Oregon company.   Under the second factor,

6  I find the burden on Defendant in having to defend this lawsuit in

7  Oregon is minimal.   *See CollegeSource,* 653 F.3d at 1080 ("[W]ith

8  the advances in transportation and telecommunications and the

9  increasing interstate practice of law, any burden [of litigation in

10 a forum other than one's residence] is substantially less than in

11 days past.")   Lyne was more than willing to travel to Oregon to

12 conduct contract negotiations and what resulted from those

13 negotiations is relevant to this litigation.   The fourth factor

14 also favors Plaintiff because Oregon has a substantial interest in

15 adjudicating disputes involving Oregon corporations. *Nike, Inc. v.*

16 *Lombardi,* 732 F. Supp. 2d 1146, 1156 (D. Or. 2010).   Lastly,

17 although the sixth factor is not of paramount importance, *id.,*

18 Defendant concedes that it "obviously" is in Plaintiff's favor.

19 (Def.'s Mem. Supp. at 21.)

20      In sum, I conclude that Plaintiff has presented a prima facie

21 case of purposeful availment by Defendant sufficient to survive a

22 motion to dismiss for lack of personal jurisdiction.

23                **B.   *Transfer of Venue Under § 1404(a)***

24      Next, Defendant argues that transfer of this matter to the

25 District of Minnesota for consolidation with Defendant's pending

26 declaratory judgment action filed there.   In determining whether a

27 _____

28      [4] Both parties concede that the third factor is neutral.

Page 15 - FINDINGS AND RECOMMENDATION

transfer of venue under § 1404(a) is appropriate, courts consider
the following factors:

> (1) the location where the relevant agreements were
> negotiated and executed, (2) the state that is most
> familiar with the governing law, (3) the plaintiff's
> choice of forum, (4) the respective parties' contacts
> with the forum, (5) the contacts relating to the
> plaintiff's cause of action in the chosen forum, (6) the
> differences in the costs of litigation in the two forums,
> (7) the availability of compulsory process to compel
> attendance of unwilling non-party witnesses, and (8) the
> ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir.
2000). The burden is on the plaintiff to show that the case is
filed in the proper venue. *Piedmont Label Co. v. Sun Garden
Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).

I conclude that this case should not be transferred to the
District of Minnesota. To begin, I note that Plaintiff's choice of
forum is given great weight and a transfer must do more than merely
shift convenience. *Lombardi*, 732 F. Supp. 2d at 1158; *Gulf Oil Corp
v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is
strongly in favor of the defendant, the plaintiff's choice of forum
should rarely be disturbed.") Such considerations are particularly
appropriate here because Plaintiff filed this action in April 2012,
one month before Defendant filed a complaint seek declaratory
relief in the District of Minnesota. According to Plaintiff's
counsel, the case filed in Minnesota "involves the same parties and
the same issues while only seeking declaratory relief." (Pl.'s
Mem. Opp'n at 22.)

The district court was confronted with a similar issue in
*Klein v. Garnder*, No. C 06-06918, 2007 WL 128228 (N.D. Cal. 2007).
The plaintiff in *Klein* filed a lawsuit in California federal court

Page 16 - FINDINGS AND RECOMMENDATION

one month after the defendants had filed a lawsuit in Oregon. *Id.* at *1. Soon thereafter, the defendants moved to dismiss or transfer the case. *Id.* In granting the defendant's motion to transfer to this district, *Klein* stated:

> [T]he Court concludes that . . . factors [set forth in *GNC Franchising*] weigh in favor of transfer. . . . Mo[st] importantly, Defendants presented substantially the same controversy to the Oregon courts first. This case was obviously brought in reaction to the filing of the lawsuit in Oregon. Where, as here, a reactive lawsuit presents substantially the same controversy as the previously filed case, the first-to-file rule demands that the case be litigated in Oregon, not California. The Court acknowledges that several witnesses and many of the business records relevant to the lawsuit are situated in California. Nonetheless, the Court does not consider these inconveniences so serious as to trump the first-to-file rule[.]

*Id.* at *4.

In short, *Klein's* guidance convinces me that the first-to-file rule demands that this case be litigated in Oregon as well.

## IV. CONCLUSION

Based on the foregoing reasons, Defendant's motion (Docket No. 7) should be DENIED in its entirety.

///
///
///

## V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **October 8, 2012**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due **October 25, 2012**. When the response is due or

Page 17 - FINDINGS AND RECOMMENDATION

1  filed, whichever date is earlier, the Findings and Recommendation

2  will go under advisement.

3       Dated this 18th day of September, 2012.

4

5                              /s/ Dennis J. Hubel

6       _____
                              DENNIS J. HUBEL
7                     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 18 - FINDINGS AND RECOMMENDATION